*1042479256*

## CANADIAN COUNTY, OKLAHOMA, CIVIL DIVISION, CIVIL JURY

| | |
|---|---|
| **CHEYENNE & ARAPAHO TRIBES,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No.:** CJ-2018-714 |
| | ) |
| | ) |
| **WATSON LABORATORIES, INC.;** | ) **COMPLAINT** |
| **ACTAVIS LLC; ACTAVIS PHARMA, INC.** | ) |
| **f/k/a WATSON PHARMA, INC.; ALLERGAN** | ) |
| **PLC f/k/a ACTAVIS PLC; ALLERGAN** | ) |
| **FINANCE, LLC; TEVA** | ) **JURY TRIAL DEMANDED** |
| **PHARMACEUTICALS INDUSTRIES, LTD;** | ) |
| **TEVA PHARMACEUTICALS USA, INC.;** | ) |
| **CEPHALON, INC.; JOHNSON & JOHNSON;** | ) |
| **JANSSEN PHARMACEUTICALS, INC.;** | ) |
| **ORTHO-MCNEIL-JANSSEN** | ) |
| **PHARMACEUTICALS, INC. n/k/a JANSSEN** | ) |
| **PHARMACEUTICALS, INC.; JANSSEN** | ) |
| **PHARMACEUTICA INC. n/k/a JANSSEN** | ) |
| **PHARMACEUTICALS, INC.; ENDO** | ) |
| **HEALTH SOLUTIONS INC.; ENDO** | ) |
| **PHARMACEUTICALS, INC.;** | ) |
| **MALLINCKRODT, PLC, d/b/a** | ) |
| **MALLINCKRODT PHARMACEUTICALS;** | ) |
| **MALLINCKRODT, LLC; DOES 1** | ) |
| **THROUGH 100, INCLUSIVE,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

FILED
MARIE HIRST COURT CLERK
CANADIAN COUNTY, OKLAHOMA

DEC 1 4 2018

BY _____ DEPUTY

CASE ASSIGNED TO:

JUDGE: **PAUL HESSE**

Plaintiff, CHEYENNE AND ARAPAHO TRIBES, complains and alleges against each and every Defendant, as follows:

1.    The Cheyenne and Arapaho Tribes are a united, federally recognized tribes of Southern Arapaho and Southern Cheyenne people in western Oklahoma. These Native people currently face a crisis that threatens to destroy their lives, land, and history like no other tragedy

in history. An epidemic of prescription opioid abuse is devastating the people, babies, institutions, and resources of Indian Country, in particular causing CHEYENNE AND ARAPAHO TRIBES (the "Tribes") substantial loss of resources, economic damages, addiction, disability, and harm to the health and welfare of the Tribes, Tribes' Members, and/or wholly-owned enterprises of the Tribes.

2.     The Defendants have engaged in a lengthy civil conspiracy, via fraud, misrepresentation, and intentional wrongful conduct, to cause as many people as possible to use and get addicted to opioid prescription pills in a maddened drive to profit billions of dollars and in a reckless disregard of the consequences to the American and Native American people.

3.     The prescription opioids epidemic has been building for years and is a current and ongoing nuisance on the property and to the lives of Tribes' Members. The Tribes lack the financial resources to adequately abate the epidemic. This epic epidemic, the worst public health crisis in the 21st Century, has been intentionally concealed, minimized, denigrated, defended, and otherwise misrepresented by the Defendants and their agents, all of which have been fueling the epidemic in order to generate billions of dollars in profits, to the detriment of the Tribes and the lives of its Members, including innocent, defenseless babies born addicted to opioids.

4.     Within the Tribes, as everywhere in the United States, prescription opioids are more addictive than any other substance, and deadlier and more devastating than any prescription or non-prescription drug, including heroin. The devastation to the Tribes is pervasive. Child welfare costs associated with opioid-addicted parents have skyrocketed. The Tribes' medical costs are overwhelming due to the costs of the opioid epidemic. Foster care costs have substantially increased, and foster care resources have been exhausted. Education and addiction therapy costs have multiplied. The Tribes have suffered economic losses from the treatment and care of babies

who are born addicted to opioids. The Tribes' housing has suffered major financial impact. The workforce of the Tribes has suffered. The Tribes' funding for the entire health and welfare of the Tribes has been imperiled.

5.     Native Americans are at least two times more susceptible to opioid addiction than the rest of the U.S. population at large. Native American high school students are two to three times more prone to try opioid pills than U.S. teenagers in general. Native Americans are three (3) times more likely to die from a drug overdose than the rest of the U.S. population. Native American Country is usually located in more rural parts of the U.S., where medically assisted addiction treatment is unavailable, underfunded, or overwhelmed by demand. Often, Native Americans cannot even find opioid addiction treatment within reasonable proximity.

6.     Prescription opioids killed over 40,000 Americans in 2017. Prescription opioids kill twice as many people in the U.S. as heroin. Prescription opioids and related drug overdose deaths exceed the number of car accident deaths in the United States. Nearly 150 Americans die every day from opioids overdoses. Almost 91% of persons who have a non-fatal overdose of opioids are prescribed opioids again within one year. One third (1/3) of all children who go into foster parent care do so because of the opioids addiction of their parent(s). Seven (7) in ten (10) opioids overdoses that are treated in an emergency room are due to abuse of prescription opioids. An opioid-addicted baby is born every thirty (30) minutes in America. Tribal Nations within the United States have suffered in greater proportion when compared to these general statistics.

7.     The Tribes and the Native American community have been left out of major initiatives by state governments, municipal governments, and county governments in attempts to remedy the opioid crisis. The Tribes, in particular, have not obtained any settlements or civil penalties with any of the Defendants as have many States. Moreover, the Tribes, in particular, have

3

not had access to the ARCOS database, as have State, County, and Municipal authorities. The Tribes, unlike States, do not have the same criminal prosecutorial powers and investigative resources of State, County, and Municipal Governments as against the Defendants and their activities. This civil action is the only remedy available to the Tribes.

8.      While prescription opioid use has decreased slightly in the U.S. in the past two years, deaths have continued to rise. The great nuisance created by the Defendants remains unabated and is not likely to be abated except via civil litigation. This nuisance is rampant within the Tribes, their Members, and their reservation lands.

9.      The Defendants, in reckless disregard for the consequences, increased prescription drug marketing and sales, and flooded the Tribes and tribal communities with prescription opioids. These facts and others as alleged in this Complaint have only recently come to light, despite Defendants' efforts to conceal the truth.

10.      The Defendant Drug Manufacturers (sometimes referred to herein as "Manufacturer Defendants") had and have a duty to prevent opioids from being overly and improperly prescribed. Defendants woefully failed in these duties, instead consciously ignoring known or knowable problems and manufacturing volumes data.

11.      Each Defendant, individually and in conspiracy with all or some of the other Defendants, intentionally and/or negligently created an opioid drug market for the masses in which vast amounts of opioids flowed freely from drug manufacturers to innocent patients who became addicted, to babies in pregnant mothers, to opioid abusers, and even to illicit drug dealers.

12.      Defendants have foreseeably caused damages to the Tribes including the costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and

deaths; (b) counseling and rehabilitation services; (c) treatment of infants born with opioid-related medical conditions; (d) welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation; and (e) law enforcement and public safety relating to the opioid epidemic within the Tribes. The Tribes have also suffered substantial damages relating to the lost productivity of the Tribes, as well as increased administrative costs.

13. The Tribes bring this civil action for injunctive relief, abatement of the opioids nuisance, compensatory damages, statutory damages, punitive damages, and any other relief allowed by law against the Defendant opioid drug manufacturers that, by their actions, knowingly or negligently have manufactured, distributed and dispensed prescription opioid drugs to and within the economic proximity of the Tribes in a manner that foreseeably injured, and continues to injure, the Tribes and their members.

14. The Tribes do not bring this action as against any of the Defendants pursuant to any contract that any Defendant has, may have, or has had with the United States Government, its agencies, and/or subdivisions, including but not limited to any contract with the Veterans Administration.

15. The Tribes do not rely upon or state any claim under or pursuant to, express or implied, as to any federal statutory or regulatory law for any claims, relief, injunctive or otherwise, or causes of action in this Complaint. None of the relief sought herein is or will be inconsistent with any federal law or regulation.

**PARTIES**

16. The Plaintiff, CHEYENNE AND ARAPAHO TRIBES, are sovereign Indian Tribes. The Tribes currently occupy the territory in western Oklahoma that includes Beckham, Blain, Canadian, Custer, Dewey, Ellis, Kingfisher, Roger Mills, and Washita Counties. The

Tribes' headquarters are in Concho, Oklahoma, which is in Canadian County. The Tribes exercise inherent governmental authority within the Reservation and on behalf of the health and welfare of the Tribes and its members, children, and grandchildren. Members of the Tribes affected by the actions and conduct of the Defendants alleged herein primarily live on the Reservation. The Tribes exercise inherent sovereign governmental authority within the Tribes' Indian Lands and on behalf of the health and welfare of the Tribes and its members ("Tribe Members"), their descendants, children, and grandchildren.

17.     A substantial number of Tribe Members have fallen victim to the opioid epidemic, becoming addicted to prescription opioids or coping with family members who are addicted. As a result, there has been a substantial increase in the caseload of counselors working in the Tribes' social and family services department. The Tribes' foster care program has also been strained by the opioids epidemic. The Tribes have seen an increase in babies born addicted to opioids due to their mother's consumption of opioids during pregnancy. Many have to be placed in foster care adding to the overload on the Tribes' program.

18.     The Tribes have incurred significant costs in an attempt to abate the opioid epidemic that continues to plague its members and Indian Lands, providing medical services and opioid-related treatments to those in need. The Tribes have incurred extraordinary costs, damages, and financial impact to every department of its Tribe Government: housing, education, security, services, medical, labor, operations, waste treatment, foster care, after school care, etc. The Tribes bring this suit, in part, to recover these costs and procure the additional financial resources required to adequately combat and abate opioid addiction, opioid-related injuries, and other problems caused by the opioid crisis.

19.     This action is brought by the Tribes in the exercise of their authority as a sovereign

government and on behalf of the Tribe in its proprietary capacity and under their *parens patriae* authority in the public interest to protect the health, safety, and welfare of all Tribe Members as well as the non-Tribe Member inhabitants of its Indian Lands to stop the growing prescription opioid epidemic within the Tribes. The Tribes also brings this action as to recover damages and seek other redress for harm caused by Defendants' improper, wrongful, fraudulent, and tortious conduct with respect to the manufacturing, marketing, and sale of prescription opioids. Defendants' actions have caused, and continue to cause, a crisis that threatens the health, safety, and welfare of the Tribes.

20.     Watson Laboratories, Inc. is a Minnesota corporation with its principal place of business in Parsippany, New Jersey. Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is a Delaware corporation with its principal place of business in New Jersey. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis LLC's sole member is Actavis US Holding LLC, a limited liability company organized under the laws of Delaware and Actavis US Holding LLC's sole member is Watson Laboratories, Inc. These defendants were owned by Allergan plc until August of 2016 at which point they were sold to Teva. Until then, Allergan plc used Actavis Pharma, Inc. and Actavis LLC to market and sell its drugs in the United States. Upon information and belief, Allergan plc has therefore exercised control over and derived financial benefit from the marketing, sales, and profits of Allergan/Actavis products. (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter are referred to collectively as "Actavis.").

21.     Allergan plc (f/k/a Actavis, plc. f/k/a Watson Pharmaceuticals, Inc.) is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.

Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) is a Minnesota limited liability company with its principal place of business in Parsippany, New Jersey. Allergan Finance, LLC is a wholly owned subsidiary of Allergan plc, which markets and sells Allergan plc's drugs in the United States. Allergan plc and Allergan Finance, LLC are collectively referred to herein as "Allergan." Allergan manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and has also manufactured, promoted, sold, the branded drugs generic versions of Duragesic and Opana.

22.     Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and Oklahoma.

23.     Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a wholly-owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011.

24.     Teva Ltd., Teva USA, and Cephalon collaborate to market and sell Cephalon products in the U.S., whereas Teva Ltd. conducts all sales and marketing activities for Cephalon in the U.S. through Teva USA. Teva Ltd. and Teva USA publicize Actiq and Fentora as Teva products. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Ltd., Teva USA, and Cephalon, Inc. are hereinafter collectively referred to as "Cephalon.").

25.     Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place

of business in Titusville, New Jersey, and is a wholly owned subsidiary of Johnson & Johnson (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Ortho-Mcneil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceutica Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are collectively referred to as "Janssen."). Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and Oklahoma, including the opioid Duragesic. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER.

26.     Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "Endo.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Oklahoma. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Oklahoma, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

27.     Mallinckrodt plc is a public limited company, headquartered in the United

Kingdom, which does business as Mallinckrodt Pharmaceuticals with its principal place of business in the United States in Hazelwood, Missouri. Mallinckrodt, LLC is a Delaware limited liability company, also doing business as Mallinckrodt Pharmaceuticals, with its principal place of business in the United States in Hazelwood, Missouri. Mallinckrodt plc and Mallinckrodt LLC are collectively referred to herein as "Mallinckrodt." Mallinckrodt is one of the largest manufacturers of the generic opioid oxycodone.

28.     Plaintiff presently lacks information sufficient to specifically identify the true names or capacities, whether individual, corporate or otherwise, of the Defendants sued herein under the fictitious names DOES 1 through 100 inclusive. Plaintiff will amend this Complaint to show their true names and capacities if and when they are ascertained.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action because: the tortious and wrongful conduct alleged herein occurred in part or whole in Canadian County, Oklahoma; the Defendants have created a nuisance on Plaintiff's Reservation Lands in Canadian County, Oklahoma; and the amount in controversy exceeds the jurisdictional minimum.

30.     Defendants engaged in activities and conduct that took place near, and had direct impacts on, land that constitutes Indian Lands of the Tribes in the State of Oklahoma. The Tribes bring this action against the Defendants based on Defendants' actions that have harmed the Tribes, and Tribe Members. Defendants have purposefully availed themselves of the advantages of conducting business within the economic proximity of the Tribes.

31.     Defendants have substantial contacts with the Tribes, Tribe Members, and the non-Tribe Member inhabitants of their Indian Lands in Oklahoma.

32.     Defendants have purposefully availed themselves of business opportunities within

the economic proximity of the Tribes' Indian Lands in Oklahoma.

33.     Defendants' conduct has caused and is causing damages to the Tribes' proprietary and sovereign interests by imposing significant costs on the Tribes' health and welfare funding and system. In addition, Defendants' conduct has caused decreased economic productivity of Tribe Members and wholly owned enterprises of the Tribes and has harmed the long-term health and welfare of the Tribe Members.

34.     Defendants' conduct has caused and is causing a crisis within the Tribes that threatens the health, welfare, economic security and political integrity of the Tribes and all their members. Because of Defendants' actions, certain members of the Tribes have become addicted to prescription opioid drugs, causing severe injury, requiring rehabilitation and medical treatment for substance abuse disorder, causing children to be born addicted to prescription opioids and other controlled substances, and causing short and long term emotional and physical damage that requires treatment, long term care, and in some instances, foster care or adoption. The adverse financial impact on the Tribes has been enormous.

35.     The negative impacts on the next generation of the Tribes' members caused by the conduct of Defendants—in particular, the ruinous effects on the health of the Tribes' children, and the removal of Tribes' member children from their parents—threaten the continuation of the Tribes' culture, identity, and self-government into the future. The impacts are so severe, cumulatively, that Defendants' conduct threatens the entire Tribes.

36.     This Court has personal jurisdiction over Defendants, each of which has substantial contacts and business dealings throughout by virtue of the marketing and sales of prescription opioids within Oklahoma and Canadian County. All causes of action herein relate to Defendants' wrongful actions, conduct, and omissions within Oklahoma and Plaintiff's damages caused by said

wrongful actions, conduct, and omissions.

37.     Venue is proper in the District Court of Canadian County, Oklahoma, because many of the Defendants' acts and omissions that gave rise to the causes of action of this Complaint occurred in this judicial District.

## BACKGROUND FACTS

38.     Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have serious risks. When used, misused, or abused, these pain-reducing medications can cause serious harm, including addiction, overdose, and death.

39.     Prescription opioids include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also called "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), or fully synthetic derivatives (such as fentanyl and methadone).

40.     Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

41.     To establish and exploit the lucrative market of chronic pain patients, Defendants developed a well-funded, sophisticated, and deceptive marketing scheme targeted at consumers and physicians. Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of

long-term opioid use—statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited all prescription opioid manufacturers. These statements were unsupported by and contrary to the scientific evidence. They also targeted susceptible prescribers and vulnerable patient populations, including that of the Tribes.

42.     Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and residents of the Tribes. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the Tribes.

43.     Defendants' direct and branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Endo agreed in 2015-16 to stop these particularly misleading representations in one state, yet continued to disseminate them in Oklahoma.

44.     Defendants also promoted the use of opioids for chronic pain through "detailers" —sophisticated and specially trained sales representatives who visited individual doctors and medical staff, and fomented small-group speaker programs. In 2014, for instance, Defendants spent almost $200 million on detailing branded opioids to doctors. These detailers were given attractive monetary incentives to get doctors to prescribe as many opioid pills as they possibly could, without regard to the nature of a patient's pain, addiction history, rehabilitation schedule, and other pertinent factors.

45.     Due to its misleading marketing, Actavis was required recently to inform doctors

that Actavis' sales representatives had distributed promotional materials that omitted and minimized serious risks associated with its opioid, Kadian, including the risk of misuse and abuse, and, specifically, the risk that opioids have the potential for being abused.

46.     Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers give the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared by Defendants. These presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

47.     Defendants' detailing to doctors was highly effective in the proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing.

48.     Defendants have had unified marketing plans and strategies from state to state, including Oklahoma. This unified approach ensures that Defendants' messages were and are consistent and effective across all their marketing efforts.

49.     Defendants deceptively marketed opioids in Oklahoma through unbranded advertising that promoted opioid use generally yet was silent as to a specific opioid. This advertising was ostensibly created and disseminated by independent third parties, but funded, directed, coordinated, edited, and distributed, in part or whole, by Defendants and their public relations firms and agents.

50.     Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny. Defendants used third-party, unbranded advertising to create the false appearance that the deceptive messages came from independent and objective sources.

51.     Defendants' deceptive unbranded marketing and sales detailing activities contradicted their branded product materials.

52.     Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid industry.

53.     Defendants entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG") (collectively referred to as "Front Groups").

54.     Defendants collaborated, through the aforementioned organizations and groups, to spread deceptive messages about the risks and benefits of long-term opioid therapy.

55.     To convince doctors and patients in Oklahoma that opioids can and should be used to treat chronic pain, Defendants had to persuade them that long-term opioid use was both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, Defendants made claims that were not supported by or were

contrary to the scientific evidence, and which were contradicted by data.

56.     To convince doctors and patients that opioids are safe, Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations—which are described below—reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, they continue to make them today.

57.     Defendants falsely claimed that the risk of opioid addiction was low, and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Some examples of these false and deceptive claims by opioid manufacturers are: (a) Actavis employed a patient education brochure that falsely claimed opioid addiction is "less likely if you have never had an addiction problem;" (b) Cephalon and others sponsored APF's *Treatment Options: A Guide for People Living with Pain*, falsely claiming that addiction is rare and limited to extreme cases of unauthorized doses; (c) Endo sponsored a website, Painknowledge.com, which falsely claimed that "[p]eople who take opioids as prescribed usually do not become addicted;" (d) Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which

16

stated that: "most people do not develop an addiction problem;" (e) Janssen distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* which described as "myth" the claim that opioids are addictive; (f) a Janssen website falsely claimed that concerns about opioid addiction are "overestimated." These claims were contrary to longstanding scientific evidence of the harms of opioids, including opioid addiction.

58.     The falsity of Defendants' claims about the low risk of addiction is manifested by independent findings that most opioid drugs have a high potential for abuse, misuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death.

59.     The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but there was no evidence to support that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This agreement, however, did not extend to benefit the Plaintiff in Oklahoma.

60.     Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction" —a term used Dr. Russell Portenoy, a KOL for Cephalon, Endo, Janssen, and others. Defendants falsely claimed that pseudo-addiction was substantiated by scientific evidence. Some examples of these deceptive claims are: (a) Cephalon and others sponsored *Responsible Opioid Prescribing*, which taught that behaviors such as

"requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated;" (c) Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain. The independent medical community recently has come to reject the concept of pseudo-addiction altogether, once the true facts came to light.

61.     Manufacturer Defendants falsely instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Manufacturer Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Manufacturer Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids in large quantities to a wide variety of patients and diverse pain scenarios. One example of these deceptive claims is that an Endo supplement in the *Journal of Family Practice* emphasized the effectiveness of screening tools to avoid addictions.

62.     Recent studies also have exposed the falsity of these misrepresentations, many noting that there are no studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse.

63.     To underplay the risk and impact of addiction and make doctors feel more

comfortable starting patients on opioids, Manufacturer Defendants falsely claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

64.     A CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by up to 20% for a few days.

65.     Manufacturer Defendants deceptively minimized the significant symptoms of opioid withdrawal and grossly understated the difficulty of tapering, particularly after long-term opioid use.

66.     Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences, and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. For example: (a) an Actavis patient brochure stated: "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction;" (b) Cephalon and others sponsored *APF's Treatment Options: A Guide for People Living with Pain*, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain;  (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain;" (d) an Endo pamphlet *Understanding Your Pain: Taking Oral Opioid Analgesics*, stated "The dose can be increased. . . . You won't 'run out' of pain relief;" (e) a Janssen patient education guide *Finding Relief: Pain*

*Management for Older Adults* listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages.

67.     These and other representations conflict with the recently established body of scientific evidence showing that overdose risk is increased at higher opioid dosages, as well as the increased risks for opioid abuse, respiratory depression, and death at higher dosages.

68.     Manufacturer Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

69.     Manufacturer Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. Actually, there was no evidence that Endo's new design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

70.     In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." The State of New York found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER. There are no studies that support the notion that abuse-deterrent technologies are a valid risk mitigation strategy for deterring or preventing abuse.

71.     These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use.

In reality, there was no evidence to support any long-term benefits of opioid therapy for chronic pain. In fact, studies showed that there was no evidence of a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least one year later.

72.     Moreover, there was a lack of evidence to support any health benefits from long-term opioid use. Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and deceptive claims, they continue to make them today.

73.     For example, Defendants falsely claimed that long-term opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives; (b) an Endo advertisement that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide *Finding Relief: Pain Management for Older Adults* stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreation, sex, walking, and climbing stairs; (d) *Responsible Opioid Prescribing,* by Cephalon, Endo and others, taught that relief of pain by opioids, by itself, improved patients' function; (e) Cephalon co-sponsored APF's *Treatment Options: A Guide for People Living with Pain* counseling patients that opioids "give [pain patients] a quality of life we deserve"; (f) Endo's NIPC website *painknowledge.com* claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse"; (g) Endo CMEs titled

*Persistent Pain in the Older Patient* claimed that chronic opioid therapy had been "shown to reduce pain and improve depressive symptoms and cognitive functioning"; (h) Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function"; and (i) Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function. These claims have no support in the scientific literature.

74.     Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by Defendants contravene the scientific evidence.

75.     Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain.

76.     Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example: (a) Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain; (b) Cephalon's sales representatives set up hundreds of speaker programs for doctors,

including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and (c) In December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News*—three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" —and not just cancer pain.

77.     Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were safe, effective, and approved for treating chronic pain.

78.     Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

79.     As a part of their deceptive marketing scheme, Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., including Oklahoma. For example, Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations.

80.     Defendants also targeted elderly patient populations who tend to suffer from

chronic pain. Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concludes that there are "special risks of long-term opioid use for elderly patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients.

81.     Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Defendants of this, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Defendants' misrepresentations, and Endo and others have recently entered agreements prohibiting them from making some of the same misrepresentations.

82.     Moreover, at all times relevant to this Complaint, Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and

KOLs. Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.

83.     Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Defendants, such as Janssen, ran similar websites that masked their own direct role.

84.     Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions.

85.     Thus, Defendants successfully concealed from the medical community and patients facts sufficient to arouse suspicion of the claims that the Tribes now assert. The Tribes did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

86.     Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not

warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

87.     Defendants' deceptive marketing scheme caused and continues to cause doctors in Oklahoma to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids. Defendants' deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent Defendants' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

88.     Defendants' deceptive marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their deceptive marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011, that spending had tripled to $288 million.

89.     The escalating number of opioid prescriptions written by doctors who were deceived by Defendants' deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and Oklahoma.

90.     Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. Every year, millions of people in the United States misuse and abuse opioid pain relievers that can lead to addiction, overdose, and death. The overdose rate among Native Americans is significantly higher than the rest of the population.

91.     The dramatic rise in heroin use in recent years is a direct result of prescription

opioids. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Another study revealed that 75% of those who began their opioid abuse in the 2000s started with prescription opioid.

92.     The Tribes have taken proactive measures to fight against prescription opioid abuse, but such measures have not deterred Defendants' conduct.

93.     Native Americans in general are more likely than general population in the United States to die from drug-induced deaths. The Tribes have been hit hard by the effects of Defendants' opioid diversion.

94.     The impact on the Tribes' children has been difficult. It has been reported that by 12th grade, nearly 13 percent of American Indian teens have used OxyContin, one of the deadliest opioids. The use of OxyContin by American Indian 12th-graders was about double the National average.

95.     There is a much higher prevalence of drug and alcohol use in the American Indian 8th and 10th graders compared with national averages. American Indian students' annual heroin and OxyContin use was about two to three times higher than the national averages in those years.

96.     The fact that American Indian teens, including the Tribes' children, are easily able to obtain OxyContin at these alarming rates indicates the degree to which opioid diversion has created an illegal secondary market for opioids.

97.     It has been reported that pregnant American Indian women are up to 8.7 times more likely to be diagnosed with opioid dependency or abuse compared to the next highest race/ethnicity; and it has been reported that in some communities upwards of 1 in 10 pregnant American Indian woman has a diagnosis of opioid dependency or abuse. On information and

belief, these statistics apply similarly to pregnant women who are Tribe Members or the mothers of Tribe Members or their descendants.

98.     Many of the parents of these Tribe Member children continue to relapse into prescription opioid use and lose custody of the children. As a result, many of these children are placed in foster care or adopted.

99.     Defendants' opioid diversion in and around the Tribes' Indian Lands contributes to a range of social problems including physical and mental consequences, crime, delinquency, and mortality. Adverse social outcomes include child abuse and neglect, family dysfunction, criminal behavior, poverty, property damage, unemployment, and social despair. As a result, more and more tribal resources are devoted to addiction-related problems, leaving a diminished pool of available resources to devote to positive societal causes like education, cultural preservation, and social programs. Meanwhile, the prescription opioid crisis diminishes the Tribes' available workforce, decreases productivity, increases poverty, and consequently requires greater government assistance expenditures by the Tribes.

100.    This civil lawsuit is the Tribes' only remaining remedy to fight against the worsening opioid abuse epidemic that Defendants have caused to the Tribes, Tribes' Members, non-Tribe Member inhabitants of the Tribes' Indian Lands (such as Tribe member spouses and descendants) and employees of the Tribes or wholly owned enterprises of the Tribes.

101.    Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Defendants should have realized that their conduct created foreseeable, unreasonable risks of harm, yet breached their duty to exercise reasonable care to prevent the harm.

## COUNT I - NUISANCE

102.    The Tribes re-allege and incorporate by reference the foregoing paragraphs.

103.    The nuisance is the over-saturation of opioids within the economic proximity of the Tribes, and to Tribes' Members, for non-medical purposes, as well as the adverse social and environmental outcomes associated with widespread opioid use, abuse, and misuse.

104.    All Defendants substantially participated in nuisance-causing activities.

105.    Defendants' nuisance-causing activities include selling or facilitating the sale of prescription opioids from premises around the Tribes—including children, people at risk of overdose or suicide, and people at risk for addiction.

106.    Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

107.    Defendants' activities unreasonably interfere with the following common rights of the Tribes' Members:

    a.    To be free from reasonable apprehension of danger to person and property;

    b.    To be free from the spread of disease within the community including the disease of addiction and other diseases associated with widespread illegal opioid use;

    c.    To be free from the negative health and safety effects of widespread illegal drug sales on premises in and around the Tribes;

    d.    To be free from blights on the community created by areas of illegal drug use and opioid sales;

    e.    The right to live or work in a community in which local businesses do not profit from using their premises to sell products that are unlawful

transactions; and

f.     The right to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

108.   Defendants' interference with these rights of the Tribes is unreasonable because it:

a.     Has harmed and will continue to harm the public health and public peace of the Tribes;

b.     Has harmed and will continue to harm the Tribes' community by increasing drug addiction, vagrancy, and property crime, and thereby interfering with the rights of the Tribe community at large;

c.     Is of a continuing nature, and it has produced a long-lasting effect; and

d.     Defendants have reason to know their conduct has a significant effect upon the public rights of the Tribes and their Members.

109.   Public resources are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources that could be used to benefit the Tribes at large.

110.   Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in the manner and method by which the Defendants created, maintained, and exploited the market for opioid prescription drugs.

111.   As a direct and proximate result of the nuisance, Tribe Members and/or wholly owned enterprises of the Tribes who live on the Tribes' Reservation Lands have suffered in their ability to enjoy the rights of the public.

112.    As a direct and proximate result of the nuisance, the Tribes have sustained economic harm by spending a substantial amount of money trying to remedy the societal harms caused by Defendants' nuisance-causing activity, including, but not limited to, costs of hospital services, healthcare, child services, law enforcement, and establishment of addiction treatment facilities and services on The Tribes' Reservation Lands.

113.    The Tribes have also suffered unique harms of a kind that is different from the Tribes' Members at large, namely, that the Tribes have been harmed in its proprietary interests.

114.    The effects of the nuisance can be abated, and the further occurrence of such harm and inconvenience can be prevented. All Defendants share in the responsibility for doing so.

115.    Defendants should be required to abate the nuisance and/or pay the expenses the Tribes have incurred or will incur in the future to fully abate the nuisance, and punitive damages.

## COUNT II - NEGLIGENCE AND GROSS NEGLIGENCE

116.    The Tribes re-allege and incorporate by reference the foregoing paragraphs.

117.    Defendants owe a non-delegable duty to the Tribes to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

118.    There is no social value to Defendants' challenged behavior. In fact, Defendants' behavior is against the law of the State of Oklahoma.

119.    On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of The Tribes and their members.

120.    There was an extremely high likelihood of Defendants' behavior foreseeably causing a substantial injury to the Tribes' interests, which in fact occurred.

121.    Defendants' conduct fell below the reasonable standard of care. Their negligent acts include:

a.   Consciously oversupplying the market in and around The Tribes with highly-addictive prescription opioids;

b.   Using unsafe distribution and dispensing practices;

c.   Affirmatively enhancing the risk of harm from prescription opioids by failing to act against known misuse and abuse;

d.   Failing to properly train or investigate their employees, including the activities of their detailers; and

e.   Failing to properly review internal and external data for over-prescription

122.   Each Defendant had an ability to control lawful, reasonable prescribing of the opioids.

123.   Each Defendant sold prescription opioids knowing both that (1) there was a substantial likelihood many of the sales were for non-medical purposes, and (2) opioids are an inherently dangerous product when used for non-medical purposes.

124.   Defendants were negligent or reckless in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

125.   Controlled substances are dangerous commodities. Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business.

126.   Defendants were also negligent or reckless in failing to guard against foreseeable misconduct, *e.g.,* the foreseeable conduct of corrupt prescribers, corrupt pharmacists and staff, and/or others who sell opioids for non-medical purposes.

127.     Defendants are in a limited class of registrants authorized to legally distribute controlled substances to, among, and within the economic proximity of the Tribes. This places Defendants in a position of great trust and responsibility vis-a-vis the Tribes. Defendants owe a special duty to the Tribes; the duty owed cannot be delegated to another party.

128.     The Tribes are without fault, and the injuries to the Tribes and their members would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

129.     The aforementioned conduct of Defendants proximately caused damage to the Tribes including increased healthcare and law enforcement costs, lower tax revenue, and lost productivity.

## COUNT III - UNJUST ENRICHMENT

130.     The Tribes re-allege and incorporate by reference the foregoing paragraphs.

131.     The Tribes have expended substantial amounts of money to fix or mitigate the societal harms caused by Defendants' conduct.

132.     The expenditures by the Tribes in providing healthcare services to people who use opioids have added to Defendants' wealth. The expenditures by the Tribes have helped sustain Defendants' businesses.

133.     The Tribes have conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities—the costs of the harm caused by Defendants' negligent distribution and sales practices.

134.     Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

135.    Defendants made substantial profits while fueling the prescription drug epidemic in the Tribes' community.

136.    Defendants continue to receive considerable profits from the distribution of controlled substances in the Tribes' Indian Lands.

137.    Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

138.    It would be inequitable to allow Defendants to retain benefit or financial advantage.

139.    The Tribes demand judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

## COUNT IV - COMMON LAW FRAUD

140.    The Tribes re-allege and incorporate by reference the foregoing paragraphs.

141.    Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain. The Defendants' false representations and concealments of material fact were committed intentionally, with malice aforethought, recklessly, and/or in a grossly negligent manner.

142.    Defendant Endo made and/or disseminated deceptive statements, including, but not limited to, the following: (a) false patient education materials; (b) advertising the ability of opioids to improve function long-term and the efficacy of opioids long-term for the treatment of chronic non-cancer pain; (c) promoting chronic opioid therapy as safe and effective for long term use for high- risk patients; (d) Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse; (e) concealing the true risk of addiction and promoting the misleading concept of pseudo-addiction; (f) promoting an unbalanced treatment of the long-term and dose-dependent

risks of opioids versus NSAIDs; (g) secretly funding pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (h) funding pro-opioid pain organizations responsible for egregious misrepresentations concerning the use of opioids to treat chronic non-cancer pain; (i) downplaying the risks of opioid addiction in the elderly; (j) CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (k) misleading scientific studies concluding opioids are safe and effective for the long-term treatment of chronic non-cancer pain and quality of life, while concealing contrary data; (l) funding and promoting pro-opioid KOLs concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudo-addiction; (m) manipulation of data regarding safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and (n) in-person detailing.

143.    Defendant Janssen made and/or disseminated deceptive statements, including, but not limited to, the following: (a) patient education materials containing deceptive statements regarding the suitability, benefits, and efficacy of opioids; (b) stating that opioids were safe and effective for the long-term treatment of chronic non-cancer pain; (c) stating that opioids improve quality of life, while concealing contrary data; (d) concealing the true risk of addiction; (e) promoting the deceptive concept of pseudo-addiction; (f) promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious, and concealing this information; (g) presenting to the public and doctors an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; (h) funding pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (i) funding pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain; (j)

using CMEs to promote false statements concerning the use of opioids to treat chronic non-cancer pain; and (k) in-person detailing.

144.    Defendant Cephalon made and/or disseminated untrue, false, and deceptive statements minimizing the risk of addiction of opioids, promoting the concept of pseudo-addiction, advocating the use of opioids for chronic non-cancer pain, funding misleading CMEs, KOL doctors, and pain organizations, minimizing the addictiveness of Cephalon's potent rapid-onset opioids, and promoting the suitability of Cephalon's rapid-onset opioids to general practitioners, neurologists, sports medicine specialists, and workers' compensation programs.

145.    Defendants Actavis and Mallinckrodt made and/or disseminated deceptive statements, including, but not limited to, the following: (a) promotion of use of opioids to treat chronic non-cancer pain to Oklahoma prescribers through in-person detailing; (b) advertising that opioids were safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improved quality of life; (c) advertising that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain.

146.    These false representations and concealments were reasonably calculated to deceive prescribing physicians in the patient areas of the Tribes, were made with the intent to deceive, and did in fact deceive physicians who prescribed opioids for chronic pain.

147.    But for these false representations and concealments of material fact, the Tribes would not have incurred excessive costs and economic loss.

148.    As a direct and proximate cause of Defendants' fraudulent conduct, the Tribes have suffered damages, and thus demands compensatory and punitive damages from and against the Defendants.

**COUNT V - CIVIL CONSPIRACY**

149.   The Tribes re-allege and incorporate by reference the foregoing paragraphs.

150.   The Defendants, in actual or tacit agreement with one another or all others at various times and places, continuously created and then saturated health care professionals with prescription opioids, despite having actual or constructive knowledge that they were habitually breaching their common law duties owed to Plaintiff.

151.   Without the Defendants' creation and saturation of the market for prescription opioids, The Tribes would not have suffered injuries and damages.

152.   No Defendant Manufacturer would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of other or all Defendant Manufacturers.

153.   As a result of the concerted action between the Defendants, the Tribes and their members have suffered damage.

154.   The Tribes demand judgment against each Defendant for compensatory and punitive damages.

## COUNT VI – OKLAHOMA CONSUMER PROTECTION ACTION, 15 O.S. §§ 751-65

155.   The Tribes re-allege and incorporate by reference the foregoing paragraphs.

156.   The Tribes bring these claims against Defendants under Sections 761.1 of the Oklahoma Consumer Protection Act.

157.   In carrying out their marketing campaigns described herein—including through advertising and sales calls—each Defendant violated the Oklahoma Consumer Protection Act.

158.   Defendants engaged in "deceptive trade practices" as defined by the Oklahoma Consumer Protection Act because Defendants made misrepresentations and omissions in marketing their opioids that deceived or could reasonably be expected to deceive or mislead consumers.

159. Further, Defendants engaged in "unfair trade practices" as defined by the Oklahoma Consumer Protection Act because Defendants made misrepresentations and omissions in marketing their opioids that deceived or could reasonably be expected to deceive or mislead consumers.

160. Defendants knowingly made false or misleading representations as to the characteristics, ingredients, uses, and benefits of their respective opioids by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of their opioids.

161. Defendants knowingly misrepresented the state of the science and material facts regarding the addictiveness of their respective opioids.

162. Defendants knowingly misrepresented the efficacy of their respective opioids by marketing their opioids as improving functions for patients for which there was no evidence to support these claims.

163. Defendants knowingly misrepresented the benefits and efficacy of their respective opioids by vastly overstating their ability to safely and effectively treat and manage pain on a long-term and/or short-term basis and omitting or downplaying the sever risk of addiction.

164. Defendants knowingly made false or misleading representations as to the source, sponsorship, approval, or certification of their respective opioids by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of their opioids and propping up these false and misleading representations with additional false statements regarding certain academic reports and studies related to opioids.

165.     Defendants also knowingly made false representations as to the sponsorship, approval, status, affiliation or connection of certain persons in the medical and academic communities with respect to opioids.

166.     Defendants misrepresented and/or omitted the results and conclusions of academic reports and studies related to the addictiveness, effectiveness, and medical necessity of their opioids.

167.     Defendants made false representations and/or omissions as to the sponsorship, approval, and/or certification by the medical professionals who performed or authored these academic reports and studies, which Defendants misused in their marketing efforts.

168.     Defendants made false representations and/or omission as to the sponsorship, approval, and/or certification by the journals that published these academic reports and studies, which Defendants misused in their marketing efforts.

169.     Defendants misleadingly used these academic reports and studies to induce consumers, to prescribe, order, and/or purchase Defendants' opioids.

170.     Defendants' misrepresentations caused actual damages to Plaintiff.

171.     Pursuant to the Oklahoma Consumer Protection Act, Plaintiff seeks all available remedies appropriate relief, including an injunction against Defendants for its violations of the Act, actual damages and penalties allowable under the Act.

### COUNT VII – PUBLIC NUISANCE, 50 O.S. § 2

172.     The Tribes re-allege and incorporate by reference the foregoing paragraphs.

173.     Plaintiff brings this cause of action against Defendants to abate the public nuisance they created.

174.    Defendants' misrepresentations and omissions regarding opioids, as set forth above, have created an opioid epidemic in Oklahoma and Plaintiff's community that constitutes a public nuisance. Defendants' acts and omissions created the opioid epidemic and thereby annoyed, injured, and endangered the comfort, repose, health and safety of others, including Plaintiff and its members.

175.    Defendants' acts and omissions offend decency.

176.    Defendants' acts and omissions render members of Plaintiff insecure.

177.    Defendants' acts and omissions proximately caused injury to Plaintiff and its members, including, *inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the Tribes seeks to abate.

178.    Defendants' acts and omissions affect the entire community of Plaintiff.

179.    Defendants also have a duty to abate the nuisance caused by the prescription opioid epidemic.

180.    Defendants have failed to abate the nuisance they created.

181.    As a direct result of Defendants' conduct, Plaintiff and Plaintiff's community have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, child protection, corrections and other services.

182.    Defendants are liable to Plaintiff for the costs borne by Plaintiff as a result of the opioid epidemic and for the costs of abating the nuisance created by Defendants.

### PRAYER FOR RELIEF

Wherefore, premises considered, Plaintiff, CHEYENNE AND ARAPAHO TRIBES, prays that the Court grant the following relief against all Defendants, individually, jointly, and severally as follows:

(a)     Injunctive Relief as against the Defendants for their wrongful, tortious, and illegal activities as alleged hereinabove, including but not limited to the abatement of the opioids nuisance on the Tribes' Reservation;

(b)     Compensatory, consequential, and incidental damages in an amount in excess of the jurisdictional minimum of this Court;

(c)     All available equitable remedies, including restitution and disgorgement of revenue and profits;

(d)     Punitive damages;

(e)     Attorneys' fees and all costs and expenses related to this civil action; and

(f)     All such other relief this Court and/or jury deems just and fair;

(g)     Trial by jury for all counts so triable.

Dated this _14_ day of December, 2018.

Respectfully Submitted,

CHEYENNE AND ARAPAHO TRIBES,

PLAINTIFF

By Its Attorneys:

LOCAL COUNSEL

Antonio Church, OBA No. 32980
Hershel Gorham, OBA No. 32786
P.O. Box 167
Concho, OK 73022
Tel.: (405) 422-7625
Fax: (405) 422-8224
achurch@c-a-tribes.org

Attorneys for the Plaintiff to be admitted *pro hac vice*:

Lael Echo-Hawk, Principal
WSBA#34525 | DC# 1500512
MThirtySix, PLLC
700 Pennsylvania Ave SE
Second Floor – The Yard
Washington, D.C. 20003
Tel.: (206) 271.0106
Fax: (202) 600.8232
Lael@MThirtySixPLLC.com

T. Roe Frazer II
Patrick D. McMurtray
Thomas Roe Frazer III
Matt Pettit
FRAZER PLC
1 Burton Hills Blvd., Suite 215
Nashville, TN 37215
Tel.: (615) 647-6464
roe@frazer.law
Patrick@frazer.law
trey@frazer.law
mpettit@frazer.law

J. Nixon Daniel, III
Mary Jane Bass
John R. Zoesch, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Tel.: (850) 432-2451
jnd@beggslane.com
mjb@beggslane.com
jrz@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
P.O. Box 2129
Fairhope, AL 36533
Tel.: (205) 252-6127
ftk@thekuykendallgroup.com

Grant D. Amey
Law Office of Grant D. Amey, LLC
P.O. Box 67
Fairhope, Alabama 36533
Tel.: (251) 716-0317
grantamey@grantamey.com